**WISCONSIN COMMUNITY SERVICE, et al. Plaintiffs,**

v.

**CITY OF MILWAUKEE Defendants.**

**No. 01–C–0575.**

United States District Court, E.D. Wisconsin.

March 16, 2004.

Robert Pledl, Kristin Fredrick, for Plaintiff or Petitioner.

Jan Smokowicz, Thomas Gardner, for Defendant or Respondent.

### DECISION AND ORDER·

ADELMAN, District Judge.

Plaintiff Wisconsin Community Service ("WCS")[1] alleges that defendant, City of Milwaukee ("City"), violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.,* and the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.,* when it refused to grant plaintiff a special use permit for an outpatient mental health clinic. I have jurisdiction pursuant to 28 U.S.C. § 1331 because plaintiff's claims arise under federal statutes. Before me now are plaintiff's motion for partial summary judgment on the issue of liability and the City's motion for summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

WCS is a private, non-profit organization that operates an outpatient mental health clinic at 2023 West Wisconsin Avenue in Milwaukee. The clinic, which occupies 7,500 square feet, provides a variety of services to almost 400 patients who suffer from mental illness.

In 1998, WCS concluded that its present facility was too small to serve its expanding clientele, and that it needed to relocate to a larger facility. After conducting a search for a suitable property, WCS offered to purchase an 81,000 square foot property at 3716 West Wisconsin Avenue, approximately one mile west of its current location. The offer was contingent on its obtaining a special use permit to operate the clinic.

### A. Initial BOZA[2] Proceeding

WCS applied to the City for a permit to use 20,000 square feet of the property as a clinic, and the City denied the application. WCS appealed to BOZA arguing that it satisfied the City's criteria for granting a special use permit, which were (1) protection of public health, safety and welfare; (2) protection of property; (3) traffic and pedestrian safety; and (4) consistency with the City's comprehensive plan, Milwaukee, Wis.Code § 295–59–5.5 (2000).[3] The Department of City Development ("DCD") recommended that BOZA deny WCS's re-

---

1. Plaintiff recently changed its name from Wisconsin Correctional Service to Wisconsin Community Service. The caption will be amended accordingly. Additionally, the complaint names two plaintiffs, Wisconsin Community Service and Wisconsin Correctional Foundation, Inc. However, the latter entity exists for the purpose of owning and managing WCS's property. Thus, I will refer to plaintiffs collectively as WCS.

2. "BOZA" is the acronym for the City's Board of Zoning Appeals.

3. The ordinance stated that the requirements for obtaining a special use permit were:

 c–1 Protection of Public Health, Safety and Welfare. The use will be designed, located and operated in a manner so that the public health, safety and welfare is protected.

 c–2 Protection of Property. The use, value and enjoyment of other property in the neighborhood will not be substantially impaired or diminished by the establishment, maintenance or operation of the special use.

 c–3 Traffic and Pedestrian Safety. Adequate measures have been or will be taken to provide safe pedestrian and vehicular access.

 c–4 Consistency with Comprehensive Plan. The special use will be designed, located and operated in a manner consistent with the city's comprehensive plan.

quest because it had not met the second criterion. DCD expressed concern that use of the property as a clinic might jeopardize the commercial revitalization of the neighborhood.

On March 22, 2001, BOZA held a hearing on WCS's appeal. WCS presented evidence in support of its request for a special use permit and argued that, if it did not meet the special use criteria, it was entitled to a permit as a reasonable accommodation under the ADA. BOZA denied the latter request on the ground that it lacked authority to hear reasonable accommodation requests.

A number of individuals from the neighborhood appeared in opposition to WCS's request for a permit. An attorney representing several area businesses testified that:

> the odds of something happening, some anti-social or unsocial behavior, are pretty slim in most areas of the city. However, if you load 100 or 200 people into an area, people who are mostly young males, unemployed, people who have histories of mental illness and/or illegal behavior, we think the odds go up. We think it's undeniable that the odds go up.

(Pledl Aff., July 3, 2001, Ex. B–1 at 00051.) In addition, a neighborhood organization encouraged residents to object to WCS's request by circulating leaflets stating:

> Many clients seeking help for mental illness have severe antisocial behavior that can create public safety problems. Clustering of these individuals in one location on a daily basis raises a serious risk for the health and well being of people living and working in surrounding neighborhoods.

(Id. Ex. B–3 at 00327–28.)

On May 9, 2001, in a written decision, BOZA denied WCS's request for a special use permit, stating that WCS had not satisfied the four special use permit criteria. However, on May 3, 2001, several BOZA members orally noted the neighborhood's "overwhelming" opposition to the clinic. (Id. Ex. B–1 at 00005–06.) One member said that the clinic "raise[d] red flags" for residents of the neighborhood, and that it was not BOZA's business to question the residents' "perceptions, which are based on the nature of the clientele who are going to be frequenting in large numbers this use." (Id. Ex. B–1 at 00007–08.)

## B. Initial Federal Court Proceeding

On June 6, 2001, WCS filed the present action. The judge to whom the case was assigned remanded it to BOZA instructing it to determine whether WCS should be granted a special use permit as a reasonable accommodation under the ADA and the Rehabilitation Act. See Wis. Corr. Serv. v. City of Milwaukee, 173 F.Supp.2d 842 (E.D.Wis.2001). Thus, the factual record was developed in the BOZA proceeding rather than, as is usual, in this court.

## C. Second BOZA Proceeding

On September 12, 2002, BOZA held a hearing on whether to grant WCS a permit as a reasonable accommodation. Clinic administrator Jill Fuller testified concerning WCS's services and the problems it faced as a result of overcrowding. She stated that WCS served individuals with severe and chronic mental illnesses, who had to qualify under state law to receive its services. She further stated that without WCS's services, its clients were at significant risk of institutionalization. She testified that the clinic provided such services as psychiatric treatment, counseling, medication monitoring, financial monitoring, housing assistance, employment assistance, grocery shopping and transportation. She indicated that most of WCS's clients lived in the area where both the present and the proposed facilities were

located, and that many clients used public transportation to reach the clinic.

Fuller testified that in recent years the number of clinic employees and clients had grown significantly and that, as a result, the clinic was overcrowded. She testified that many clients could not cope with the stimuli associated with overcrowding. She stated that this problem was a serious one, not merely an inconvenience:

> I just want to reiterate that our clientele have a thought disorder and a brain disorder, so they don't think like we do, and they don't experience things like we do, which is why overcrowding is so serious for them. In the DMV [Department of Motor Vehicles] analogy, [if I go to the DMV to get my license,] I'm able to function there. If any of our clients need to go to DMV [sic] or any other health care facility where there's a crowd or shopping, we always go with them, because they can't cope with that external stimuli very well.

(Pledl Aff., April 23, 2003, § F–2, at 20.) She added that overcrowding in the common areas of the clinic was stressful for WCS's clients, and that the problem was compounded by their poor social skills. She said that the clinic relied heavily on regular one-on-one sessions between clients and therapists, and that the privacy of such sessions was compromised by the lack of space. She also testified that WCS's limited space had impaired its ability to provide a number of therapeutic services that were beneficial to its clients.

WCS also presented evidence from two clinicians about the problems caused by overcrowding at WCS. Patricia Rutkowski, a clinical consultant for the Wisconsin Department of Health and Family Services, Bureau of Community Mental Health, stated that the clinic was so crowded, noisy and smoky that its clients experienced distress. She said that mentally ill individuals experienced overcrowding as over-stim-ulation, and that it increased their anxiety and caused their symptoms to become more acute. John Chianelli, the program director for Service Access to Independent Living, an organization that provides assistance to mentally ill individuals, wrote that the "clinic is very crowded, providing an unsafe and unhealthy environment for persons with mental illness. This noisy, overcrowded and inadequate space in fact, contributes to an individuals [sic] emotional instability." (Chianelli Aff., Ex. A.)

Dr. Nancy Frank, Department Chair and Associate Dean at the University of Wisconsin–Milwaukee School of Architecture and Urban Planning, testified as an expert witness for WCS. She stated that locating the clinic at 3716 West Wisconsin Avenue would be consistent with current uses in the neighborhood and with the City's zoning policy, and that the clinic would positively rather than adversely affect the surrounding area. She stated that a properly zoned health clinic was already located directly across the street from the proposed site. She also stated that the clinic would encourage commercial uses in the neighborhood because:

> vacant buildings are like the last thing you want to do when you're redeveloping an area. You really want to get tenants, you want to get good tenants who are going to maintain the building, but you really don't want a vacancy. And the benefits are you bring in this tremendous body of employees, a number of which I have to assume, given their professional positions, are well paid, who are going to want services like restaurants, dry cleaners, coffee shops, all of those sorts of things, and people notice that there's a demand, businesses start moving in, the more businesses that are there, the more that the drive-by traffic goes, "You know, this area is really starting to pick up," they stop,

they try it. That increases demand further, more businesses move in.

It's actually a strategy in urban redevelopment to try to get a good non-profit anchor in an area first because they're often less dependent on having an area that already has a lot of consumer demand, and you can then build on that employee base.

(Pledl Aff., April 23, 2003, § F–2, at 58.)

Fuller and Stephen Swigart, WCS's executive director, testified about WCS's search for a new location. They indicated that WCS commenced the search in 1998 by creating a search committee consisting of Fuller, Swigart, and Rick Brittain, a clinic employee who had experience in real estate. It then established criteria for the new site, which were: (1) a central location; (2) adequate size; (3) good bus service; (4) a safe neighborhood; (5) a building that was in reasonably good condition and had a serviceable floor plan; and (6) adequate parking. In an effort to identify suitable properties, WCS contacted a number of realtors. It investigated numerous properties, but most turned out to be infeasible for reasons such as interior layout, asbestos removal, remodeling costs and neighborhood safety. Ultimately, WCS found two satisfactory properties, one on the near south side and the other, the 3716 West Wisconsin Avenue site. It offered to purchase the south side facility, but the offer was declined because it was contingent on zoning approval. WCS then extended an offer on the 3716 West Wisconsin Avenue property with the same contingency, and the offer was accepted.

WCS presented evidence that, after the initial BOZA decision, it attempted to find a property that did not require a special use permit. It purchased a set of City zoning maps and searched for adequate sites that had the necessary zoning. When it found none, it asked DCD to assist it in locating a suitable property.

However, even with DCD's help, its efforts were unsuccessful.

WCS also presented evidence that while it was attempting to find alternatives to the Wisconsin Avenue property, the owner of that property became impatient. Therefore, to avoid losing the site, WCS purchased it even though it had not yet secured zoning approval.

At the hearing, a question arose concerning a property located at 700 West Michigan Avenue. Swigart stated that such property did not require a special use permit, but that realtors had informed WCS that the price of the property was $4 million, more than it could afford. David Barry, a commercial realtor, testified on behalf of the City that if WCS had engaged a buyer's broker such as himself, it could have discovered that the owner was willing to reduce the price to $2.2 million.

The area alderman, Michael Murphy, testified that locating a mental health clinic at the proposed site might be "fatal" to the City's efforts to revitalize the area. (*Id.* at 94.)

At the hearing, no evidence was presented indicating that WCS's clients posed a risk to the safety of the neighborhood.

On December 27, 2002, BOZA denied WCS's request for an accommodation, stating that an accommodation was neither reasonable nor necessary. In a written decision, BOZA stated that WCS's testimony that its clients would benefit from a larger facility was an "overgeneralization" because individuals with mental illness would not "respond ... in the same way," and that it was not possible to determine whether WCS's clients would "benefit uniformly or as a group from the proposed accommodation." (*Id.* § H at 2.) BOZA also stated that rather than relying on realtors and its own search committee, WCS should have hired a buyer's broker

such as Barry. Additionally, echoing Murphy's statement, it stated that locating a clinic at the proposed site might be fatal to revitalizing the area because it was "not a business." (*Id.* at 5.) Finally, BOZA stated that granting WCS a special use permit would fundamentally alter the City's zoning scheme because it would encourage other groups serving the disabled to seek accommodations:

> Every time a social service agency, AA club, homeless shelter serving mentally ill homeless people; hospital, psychologists or psychiatrists office [sic], therapists' office, etc. wanted to locate their business in a zoning district requiring a special use to do so, the City or this Board would have to automatically consider giving them an accommodation under ADA regardless of the special use criteria in the City's ordinance.

(*Id.* at 3.)

### D. Second Federal Court Proceeding

On January 24, 2003, WCS reinstated its action in federal court. The judge to whom the case was assigned permitted the Wisconsin Coalition for Advocacy, Inc. and the Milwaukee chapter of the National Alliance of the Mentally Ill to participate as amici curiae. He had previously granted such status to Marquette University High School. Subsequently, the judge recused himself, and the case was randomly reassigned to me.

Additional facts will be stated in the course of the decision.

### II. STANDARD OF REVIEW

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), courts should act with caution in granting summary judgment, *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id.* at 248, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. The moving party may satisfy its initial burden simply by pointing out that there is an absence of evidence supporting the non-moving party's case. *Id.* at 325, 106 S.Ct. 2548. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. 2548. Neither party may rest on mere allegations or denials in the pleadings, *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the

nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991).

When, as here, the parties file cross motions for summary judgment, I assess each party's motion independently, *see Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir.1997), first taking all facts and inferences in the light most favorable to one party, then taking all facts and inferences in the light most favorable to the other.

In their summary judgment motions, both parties rely on the evidence that was adduced before BOZA. However, I apply normal summary judgment standards and owe no deference to any of BOZA's conclusions.

## III. DISCUSSION

I address plaintiff's motion for partial summary judgment first and, therefore, draw all inferences in the light most favorable to defendant. Based on the evidence presented, I conclude that plaintiff's motion must be granted.

## A. Requirements of ADA and Rehabilitation Act

WCS argues that based on the evidence presented the City's refusal to grant it a special use permit violated the ADA and the Rehabilitation Act. The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in [29 U.S.C. § 706(8)], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794.

The relevant provisions of the ADA and the Rehabilitation Act are similar, and precedent under one statute typically applies to the other. *See Wis. Corr. Serv.*, 173 F.Supp.2d at 849 (collecting cases). To establish a violation of Title II of the ADA, WCS must show (1) that its clients are "qualified individuals with a disability"; (2) that they are being excluded from participation in or denied the benefits of some service, program or activity by reason of their disability, or subjected to discrimination by reason of their disability; and (3) that the entity providing the service, program or activity is a public entity. *See First Step, Inc. v. City of New London*, 247 F.Supp.2d 135, 149 (D.Conn. 2003); *Innovative Health Sys., Inc. v. City of White Plains*, 931 F.Supp. 222, 238 (S.D.N.Y.1996) (*"Innovative I"*). To establish a violation of the Rehabilitation Act, WCS must show (1) that its clients are "individuals with disabilities" within the meaning of the Act; (2) that they are "otherwise qualified" to participate in the activity or program or to enjoy the services or benefits offered; (3) that they have been excluded from participation, denied benefits of, or subjected to discrimination under any program or activity solely by reason of their disabilities; and (4) that the entity denying them participation or enjoyment receives federal financial assistance. *See First Step, Inc.*, 247 F.Supp.2d at 149; *Innovative Health Sys., Inc.*, 931 F.Supp. at 238.

It is not disputed that WCS's clients are "qualified individuals with a disability" under the ADA and "individuals with disabilities" and "otherwise qualified" under the Rehabilitation Act.[4] It is likewise agreed that the City is a public entity, and that it receives federal financial assistance. In addition, the ADA and the Rehabilitation Act apply to the City's zoning decisions. *See Wis. Corr. Serv.*, 173 F.Supp.2d at 851; *see also Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir.2002) (applying ADA to zoning decisions by BOZA). Thus, the sole issue is whether the City discriminated against WCS's clients on the basis of their disability. WCS may prove discrimination by showing intentional discrimination, disparate impact, or failure to make a reasonable accommodation. *First Step, Inc.*, 247 F.Supp.2d at 150 (citing *Reg'l Econ. Cmty. Action Program, Inc.*, 294 F.3d at 48). WCS alleges discrimination based on each of the above grounds; however, address only its reasonable accommodation argument because it is dispositive.

**B. Reasonable Accommodation**

**1. Applicable Standards**

 Under the ADA and the Rehabilitation Act, a public entity must reasonably accommodate a qualified individual with a disability by making changes in rules policies, practices or services when needed. *See Oconomowoc Residential Programs, Inc.*, 300 F.3d at 782–83. The parties state that the ADA and the Rehabilitation Act require accommodation if the accommodation is (1) reasonable and (2) necessary (3) to afford a handicapped person equal opportunity. These elements are derived from cases involving the Fair Housing Amendments Act ("FHAA"), under which an accommodation is required if it is (1) reasonable and (2) necessary (3) to afford a handicapped person the equal opportunity *to use and enjoy a dwelling.* 42 U.S.C. § 3604(f)(3)(B); *Oconomowoc Residential Programs, Inc.*, 300 F.3d at 783. However, in the present case, WCS requests an accommodation not because its clients need a dwelling but because they need mental health services. Thus, an initial question is whether the FHAA standards are applicable.

The FHAA defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Title II of the ADA does not contain similar language, but the regulations implementing it state that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). The Rehabilitation Act similarly requires reasonable accommodation unless it creates "undue financial or administrative burdens" or "requires a fundamental alteration in the nature of the program." *See* Bonnie P. Tucker & Bruce A. Goldstein, *Legal Rights of Persons with Disabilities: An Analysis of Federal Law* 5:6 (1991).

---

4. WCS has standing to pursue claims under the ADA and Rehabilitation Act because such Acts extend to any person aggrieved by the discrimination against a person on the basis of his or her disability. *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 46 n. 2 (2d Cir.2002); *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 332–36 (6th Cir.2002); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 46–48 (2d Cir.1997) ("*Innovative II*"), overruled on other grounds by, *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163 (2d Cir.2001).

Thus, under the ADA and the Rehabilitation Act, reasonable accommodation includes the elements of "reasonableness" and "necessity" but not that of equal opportunity. Further, unlike housing, the general public does not require mental health services; thus, in the present case, it makes little sense to inquire whether the disabled are entitled to equal opportunity to such services. Moreover, the Seventh Circuit's definition of necessity includes the reason why the accommodation is necessary, i.e. to "affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." ' *Oconomowoc Residential Programs, Inc.,* 300 F.3d at 784 (quoting *Dadian v. Vill. of Wilmette,* 269 F.3d 831, 838 (7th Cir. 2001)); *see also Bronk v. Ineichen,* 54 F.3d 425, 429 (7th Cir.1995). Thus, in order to prevail, WCS must show only that its requested accommodation is reasonable and necessary. It if makes such a showing, the City must then demonstrate unreasonableness or undue hardship in the particular circumstances. *Oconomowoc Residential Programs, Inc.,* 300 F.3d at 783.

**2. Reasonableness**

■ Whether a requested accommodation is reasonable is a highly fact-specific inquiry and requires balancing the needs of the parties. *Id.* at 784 (citing *Dadian,* 269 F.3d at 838). An accommodation is reasonable if it is efficacious and proportional to the costs to implement it. *Id.* (citing *Vande Zande v. State of Wis. Dep't of Admin.,* 44 F.3d 538, 543 (7th Cir.1995)). That is, an accommodation is reasonable if the benefit that it will provide to the disabled individual outweighs the cost to the public entity to implement it. *Vande Zande,* 44 F.3d at 542–43. If the cost outweighs the benefit only slightly, the requested accommodation is not necessarily unreasonable. *Id.* at 542. However, if the cost is disproportionate to the benefit

such that the public entity is being asked to expend enormous sums in order to bring about a trivial improvement in the life of a disabled person, the requested accommodation is unreasonable. *Id.* at 542–43. In the present case, the reasonableness inquiry involves balancing the benefit that WCS's clients will receive from being served by a larger facility against the cost that the City will incur if the special use permit is granted.

**a. Benefit to WCS's clients**

WCS presents substantial evidence that its clinic is overcrowded and that, as a result, its disabled clients are harmed. Jill Fuller testified that many of WCS's clients could not cope with the stimuli caused by overcrowding in the clinic and became very stressed. She also testified that the overcrowding prevented the clinic from providing beneficial therapeutic services to its clients and compromised the privacy of therapy sessions. Knowledgeable clinicians supported Fuller's testimony. Patricia Rutkowski stated that the clinic was crowded, noisy and smoky and that the resulting atmosphere was distressing for individuals suffering from mental illness. She stated that the overcrowding caused clients to become overstimulated, and that it increased their anxiety. John Chianelli endorsed Fuller's and Rutkowski's observations, stating that the overcrowding and shortage of space contributed to clients' "emotional instability." (Chianelli Aff., Ex. A.)

Thus, WCS has established that its clinic is overcrowded and that the overcrowding aggravates the effects of its clients' mental disabilities and diminishes its capacity to provide services that ameliorate such effects. It has demonstrated that moving to a larger facility would substantially benefit its clients. *See First Step, Inc.,* 247 F.Supp.2d at 140, 154–55 (finding that city

was required to grant organization that provided outpatient treatment to the mentally disabled a special use permit in order to allow the organization to move to a larger facility and improve its services).

Notwithstanding the testimony of Fuller, Rutkowski and Chianelli, the City disputes that a larger facility would benefit WCS's clients. However, it presents no evidence rebutting such testimony. Rather, echoing BOZA, it argues that it is not possible to determine whether WCS's clients will benefit from an uncrowded clinic and, citing Fuller's testimony that change can be stressful for the mentally ill, asserts that some of WCS's clients might react negatively to a new location. However, the City's argument tears Fuller's statement from its context. Fuller testified unequivocally that a larger facility would benefit WCS's clients and expressed no concern about possible adverse effects. In sum, the City's contention that WCS's clients would not benefit from a larger facility is neither supported by the record nor persuasive.

### b. Cost to City

Next, I assess whether the benefit of the accommodation to WCS's clients is outweighed by its cost to the City. The City argues that WCS's proposed use of the Wisconsin Avenue property is inconsistent with its zoning code and would hamper its efforts to revitalize the area. However, the evidence does not support the City's argument. The evidence indicates that the clinic would not conflict with City zoning. First, although under the zoning code a

mental health clinic at 3716 West Wisconsin Avenue requires a special use permit, it is nevertheless a permitted use of the property. A special use is one that is not inherently incompatible with an area but which is reviewed on an individual basis. *Skelly Oil Co. v. City of Delafield,* 58 Wis.2d 695, 700–01, 207 N.W.2d 585 (1973). Second, expert witness Nancy Frank testified that locating a clinic at the proposed site was consistent with the zoning and with other uses in the neighborhood. She testified that a health clinic was located across the street from the proposed facility and that the proposed site was similar to WCS's current site. She stated that WCS's current facility had not adversely affected the area and that the proposed facility would not either.[5]

The evidence also does not support the City's argument that the proposed facility will hamper its efforts to revitalize the area. On this point, Frank testified that WCS's clinic would benefit the economic development of the area. She stated that having a good tenant like WCS that would maintain the building was far more desirable than having vacant property in the area. Moreover, she said that the clinic would employ a number of professionals who would bring some economic benefits to the neighborhood. The City presented no evidence rebutting Frank's testimony.

Further, if the City were successful in preventing WCS from locating a clinic at 3716 West Wisconsin Avenue, there is no evidence that a commercial enterprise would locate there. In fact, two non-com-

---

5. Indeed, the record does not support BOZA's conclusion that WCS's clinic would be inconsistent with the four special use criteria in the zoning code. First, there was no evidence that denying the permit was necessary to protect the public health, safety and welfare. Second, there was no evidence that the clinic would "substantially impair" the use, value and enjoyment of other property in the neighborhood. Third, there was no evidence that

the clinic posed a threat to traffic or pedestrian safety. Finally, given Nancy Frank's uncontroverted testimony, there was no evidence that the clinic would be inconsistent with the City's comprehensive zoning plan. Even though the clinic may not be the City's ideal use of the property, that does not make such use inconsistent with the comprehensive plan.

mercial entities, the Social Security Administration and the Milwaukee office of the National Alliance for the Mentally III, presently lease space in the building. Moreover, if a commercial entity wished to locate on the property, the presence of WCS's clinic would not prevent it from doing so. This is so because WCS plans to use only 20,000 square feet of the building and rent out, possibly to commercial entities, most of the remaining 61,000 square feet. Thus, the City's argument that locating WCS's clinic on the site will cost the City a commercial use of the property is unsupported by the evidence.

The City has not established that it will suffer any cost if a special use permit were granted. It has not shown that the proposed facility would be inconsistent with local zoning or with other uses in the neighborhood. Its argument that the clinic would interfere with its goal of revitalizing the area is both unsupported by the record and highly speculative. Further, any cost that the City might incur if the special use permit were granted is outweighed by the benefits that the new clinic would bring to WCS's clients. As discussed, the proposed facility will ameliorate some of the effects of WCS's clients' disabilities. Thus, WCS has established that the requested accommodation is reasonable, and the City has not demonstrated undue hardship in the circumstances. *Oconomowoc Residential Programs, Inc.,* 300 F.3d at 783.

The City also argues that if the special use permit is granted, it will be required to grant accommodations to other agencies serving the disabled, which, in turn, will cause a fundamental alteration to the City's zoning plan. This argument is unpersuasive. It ignores that an applicant must satisfy requirements to obtain an accommodation and that the reasonableness of a requested accommodation is a highly fact-specific inquiry. *Id.* at 784 (citing *Dadian,* 269 F.3d at 838).

### 3. Necessity

■ To obtain the requested accommodation, WCS must also establish that it is necessary, i.e., that it will affirmatively enhance its clients' "quality of life by ameliorating the effects of [their] disability." *Id.* (quoting *Dadian,* 269 F.3d at 838); see also *Bronk,* 54 F.3d at 429. For the reasons stated, WCS has established that the proposed facility will ameliorate some of the effects of its clients' mental illness. However, the City makes two arguments as to why the requested accommodation is unnecessary.

First, it asserts that even if a larger facility will enable WCS to provide better care to its clients, it is unnecessary because the care that WCS presently provides meets state and federal standards. However, if this argument was accepted, it would mean that an agency serving the disabled could not obtain an accommodation to relieve it from a problem unless the problem was so severe that it caused the agency to provide substandard care. An agency could never head off a problem before it became acute. This is not the law. To establish necessity, an entity seeking an accommodation need not show that its plight is desperate but only that the accommodation will ameliorate the effects of a disability. *Oconomowoc Residential Programs, Inc.,* 300 F.3d at 784. Thus, this argument is rejected.

Second, the City argues that the requested accommodation is unnecessary because WCS could have selected the 700 West Michigan Avenue property, which did not require a special use permit.[6]

---

**6.** BOZA concluded that WCS could also have selected the near southside property, but the City does not make this argument, apparently because the property required a special use permit.

However, WCS presents evidence that its realtors informed it that the price of the property was $4 million, more than it could afford, and that it did not discover that the owner would have reduced the price to $2.2 million until after it purchased the Wisconsin Avenue property. The City presents evidence that if WCS had hired a buyer's broker such as City witness David Barry, it might have been able to discover that the owner was willing to sell the property for $2.2 million. However, to establish necessity, a plaintiff requesting a reasonable accommodation need only show that it made a good faith effort to find an alternative to the accommodation but was unable to do so. *Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Township*, 996 F.Supp. 409, 438 (D.N.J. 1998). Neither the ADA nor the Rehabilitation Act requires an agency searching for a suitable property to hire a buyer's broker. In the present case, WCS presents substantial evidence that it engaged in a good faith effort to find alternative sites. It formed a search committee, consulted with a number of realtors and evaluated numerous properties.

WCS also presents evidence that after the first BOZA decision, it attempted to locate a property that did not require a special use permit. It purchased a complete set of zoning maps from the City and focused its search on areas with proper zoning. When these efforts were unsuccessful, it sought the assistance of DCD. It then considered a number of additional properties, but none were satisfactory.. WCS was not indifferent to the City's zoning code or to its suggestions. *Cf. id.* at 438. Moreover, the City did not suggest to WCS that it should hire a buyer's broker. Nor is there evidence that WCS knew or should have known that doing so would have improved its chances of finding a facility which did not require a special use permit.

In sum, the evidence shows that WCS made a good faith effort both to find a suitable property and to find a property that did not require a special use permit. The fact that its search might have been more successful if it had hired a buyer's broker does not render its requested accommodation unnecessary.

### 4. Undue Hardship

Because WCS has met its burden of establishing that the requested accommodation is reasonable and necessary, in order for the City to prevail, it must show that the accommodation would in the particular circumstances of the case, cause undue hardship. *Oconomowoc Residential Programs, Inc.*, 300 F.3d at 787. However, for the reasons stated, the City has not made such a showing.

## IV. CONCLUSION

For the reasons set forth above, I conclude that no reasonable jury could find that WCS's request for a special use permit as an accommodation was not reasonable or necessary. Further, no reasonable jury could conclude that the accommodation will cause undue hardship to the City. Therefore, plaintiff's motion for partial summary judgment with respect to the City's liability for violating the ADA and the Rehabilitation Act is granted, and the City is ordered to grant WCS's request for a special use permit. Accordingly, the City's motion for summary judgment is denied.

**Therefore, for the reasons stated,**

**IT IS ORDERED** that plaintiffs' motion for partial summary judgment is **GRANTED** as set forth above.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment is **DENIED.**

**IT IS FURTHER ORDERED** that defendant's motion to strike is **DENIED** as **MOOT.**

**IT IS FURTHER ORDERED** that the City issue a special use permit to WCS allowing it to operate a mental health clinic at 3716 West Wisconsin Avenue.

**FINALLY, IT IS ORDERED** that the court will hold a telephonic status conference on **March 30, 2004 at 10:30 a.m.** The court will initiate the call.