# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-1966

WISCONSIN COMMUNITY SERVICES, INC., and WISCONSIN
CORRECTIONAL SERVICE FOUNDATION, INC.,

*Plaintiffs-Appellees*,

v.

CITY OF MILWAUKEE, WISCONSIN,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01-C-575—**Lynn Adelman**, *Judge.*

_____

ARGUED JANUARY 3, 2005—DECIDED JUNE 29, 2005

_____

Before BAUER, EASTERBROOK, and WOOD, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Wisconsin Community
Services (WCS), a nonprofit corporation, provides services
for the benefit of former prisoners and persons with mental-
health or drug-abuse problems. Its web site at
www.wiscs.org describes the organization's background and
current operations, such as half-way houses, alcohol and
drug-abuse treatment programs, and employment counsel-
ing. Its outpatient mental-health clinic in central Milwau-
kee is overcrowded; WCS deems the 7,500-square-foot
facility inadequate to serve the 400 clients who frequent it.
After a search, WCS purchased a building about one mile

west of the existing facility. (Technically Wisconsin Correctional Service Foundation bought and leased it to WCS; we refer to both affiliates as "WCS.") It wants to use 20,000 square feet of this building as a mental-health clinic. Because the structure is in a business zone, operation of a mental-health clinic depends on a special-use permit under Milwaukee's zoning code. See Milwaukee Code of Ordinances §295-603-1.

Milwaukee's Board of Zoning Appeals held a hearing and denied WCS's request for a special-use permit. Its decision refused to take account of federal statutes, such as Title II of the Americans with Disabilities Act and the Rehabilitation Act, that may require governmental bodies to make exceptions for the benefit of disabled persons. After the district court reminded the Board (and the City) that the Constitution's supremacy clause requires all state and local actors to comply with federal law, see 173 F. Supp. 2d 842 (E.D. Wis. 2001), a new hearing was held. The outcome was the same, because the Board concluded that WCS could have purchased or leased space elsewhere. More than 785 acres of land within WCS's preferred area for operating the mental-health clinic are zoned for medical clinics; no deviation from Milwaukee's normal rules would have been required to use any of these sites. And under the normal rules, the Board stated, a special-use permit was inappropriate because a medical clinic at the site could undermine a redevelopment plan that called for a commercial enterprise to be situated there. WCS returned to the federal court, which granted summary judgment in its favor and directed the City to issue the requested special-use permit. 309 F. Supp. 2d 1096 (E.D. Wis. 2004). Federal law requires the City to accommodate the foundation's clients, the court held, whether or not the Board engaged in discrimination and whether or not the zoning code has a disparate impact on disabled persons.

Neither Title II of the ADA nor the Rehabilitation Act, 29 U.S.C. §794, contains a general accommodation provision. There are lots of specific ones, such as the wheelchair-accessibility requirement for public transit, see 42 U.S.C. §12162, but nothing general. There is a general accommodation rule in Title III, which deals with public accommodations and services operated by private entities, see 42 U.S.C. §12182(b)(2)(A)(ii)-(iv), but Title II, which covers public services in the governmental realm, lacks the sort of accommodation requirement to be found in Title III (or for that matter Title I, which we discuss below). An accommodation requirement has been added to Title II by regulation, 28 C.F.R. §35.130(b)(7), and to the Rehabilitation Act by judicial gloss plus another regulation, 28 C.F.R. §41.53. Milwaukee does not question the propriety of either the regulations or the gloss. But see *Southeastern Community College v. Davis*, 442 U.S. 397, 410-11 (1979) (doubting the validity of both the gloss and the regulation); *Olmstead v. L.C.*, 527 U.S. 581, 592 (1999) (reserving these subjects for future decision).

The Fair Housing Amendments Act, 42 U.S.C. §3604(f)(3)(B), which covers related ground, contains an express accommodation requirement, and the district court understood the regulation and the gloss under Title IV and the Rehabilitation Act to track the FHAA. See *Washington v. Indiana High School Athletic Ass'n*, 181 F.3d 840, 845 n.6 (7th Cir. 1999). Again the parties do not ask us to do otherwise. We shall assume, given the lack of argument to the contrary, that the legal rules are identical, which leads us to *Hemisphere Building Co. v. Richton Park*, 171 F.3d 437 (7th Cir. 1999), and *Good Shepherd Manor Foundation, Inc. v. Momence*, 323 F.3d 557, 561-64 (7th Cir. 2003), both of which arose under the FHAA.

The district court concluded that Milwaukee had to accommodate WCS by permitting it to open a clinic at its new location because (a) its disabled clients need more

space, and (b) the building WCS purchased was its least-cost option. Then it found that WCS's proposal would be a "reasonable" accommodation of its financial situation. 309 F. Supp. 2d at 1104-08. Like other charitable organizations, WCS is strapped for cash and can do more for its clients if it can situate facilities where the benefit/cost ratio is highest.

Getting from that proposition to a legal rule that Milwaukee must permit WCS its preferred location is, however, a major problem—for *Hemisphere Building* (a decision that the district judge did not cite) held that the FHAA does not require municipalities to depart from their zoning codes to reduce the cost at which disabled persons can acquire housing (or, here, mental-health services). We explained that the reasonable-accommodation requirement applies to "rules, policies, etc. that hurt handicapped people *by reason of their handicap*, rather than that hurt them solely by virtue of what they have in common with other people, such as a limited amount of money". 171 F.3d at 440 (emphasis in original). See also *United States v. Palatine*, 37 F.3d 1230, 1234 (7th Cir. 1994).

The district court got off on the wrong foot by assuming that "WCS may [prevail] by showing intentional discrimination, disparate impact, *or* failure to make a reasonable accommodation." 309 F. Supp. 2d at 1104 (emphasis added). As we explained in *Hemisphere Building*, the FHAA's accommodation requirement is not free standing. See also *Brandt v. Chebanse*, 82 F.3d 172 (7th Cir. 1996). Accommodation in the FHAA's parlance is the means by which disparate impact is alleviated. If a zoning or building-code rule bears more heavily on disabled than on other persons, the city must change the rules to the extent necessary to redress the adverse effect. In the absence of disparate impact, however, there is no need for accommodation under the FHAA.

A requirement that imposes equal cost on all persons does not have such a disparate impact. Just as everyone (disabled or not) needs housing and would prefer to pay less, so everyone (disabled or not) needs medical care and would prefer to pay less. If Milwaukee applies the same rules to mental-health clinics and dental-health clinics, there is neither discrimination nor disparate impact. The statutes do not require a city to be more forgiving when mental-health clinics want to bend the rules than when dental-health clinics make the same request.

Some language in *Good Shepherd Manor* might be understood to support the district judge's approach. We wrote: " 'Failure to reasonably accommodate' is an alternative theory of liability. The theory would be entirely redundant if it required proof that the defendants' actions were motivated by animus toward the handicapped. Indeed for the reasonable accommodation theory to be meaningful, it must be a theory of liability for cases where we assume there is a valid reason behind the actions of the city, but the city is liable nonetheless if it failed to reasonably accommodate the handicap of the plaintiff." 323 F.3d at 562. To say that reasonable accommodation is an "alternative theory of liability" is not, however, to say that it is a theory *independent* of both intentional discrimination and disparate impact; that would contradict *Hemisphere Building*, which the panel in *Good Shepherd Manor* did not purport to do. We understand this passage of *Good Shepherd Manor* as a restatement of the point made in *Hemisphere Building*: reasonable accommodation is a theory independent of intentional discrimination because it is the means by which disparate impact is alleviated. The panel in *Good Shepherd Manor* did not suggest that there is a duty to accommodate when laws and regulations neither discriminate nor cause disparate effects. Proof of one or the other is essential.

According to WCS, the Supreme Court disapproved this court's approach in *US Airways, Inc. v. Barnett*, 535 U.S.

391 (2002). That decision considered how seniority systems interact with 42 U.S.C. §12112(b)(5)(A), the accommodation requirement in Title I of the ADA, which covers employment. This section defines as a form of discrimination "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity". *Barnett* held that an obligation to depart from a seniority system almost always would "impose an undue hardship" on the business, though the Court did not rule out the possibility that some modifications would not do so.

Title II of the ADA, which governs WCS's claim, lacks any language comparable to §12112(b)(5)(A). The accommodation requirement of the FHAA, from which the rule of decision has been borrowed, has a different structure. Instead of directing the employer to treat disabled persons with special solicitude, as Title I does, the FHAA defines as discrimination "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person *equal opportunity* to use and enjoy a dwelling" (emphasis added). The point of this clause is to assure "equal opportunity"—which, we concluded in *Hemisphere Building*, means freedom from the adverse effects of local laws and rules that affect disabled persons because of that disability, yet do not pose problems for equivalent but non-disabled persons. The Title II regulation is similar to this clause in the FHAA, requiring accommodations that "are necessary to avoid discrimination". 28 C.F.R. §35.130(b)(7). Nothing in *Barnett* undermines the way we read "equal opportunity" language in *Hemisphere Building*. The problem that WCS encountered is financial, and Milwaukee's rules pose the same financial considerations to all would-be users of the property.

The district court did not find that Milwaukee's zoning rules bear more heavily on the kind of medical services that the disabled need especially frequently than on the kinds of medical services that all members of the populace require. Milwaukee's zoning rules, and its stated criteria for special-use permits, treat mental-health and dental-health clinics identically. Both are "health clinics" under its zoning scheme. See Milwaukee Code of Ordinances §295-7-31 (definition), §295-59-5.5 (special-use criteria). The parties agree that more than 785 acres zoned for use by "health clinics" lie within WCS's preferred area for its new clinic, and that WCS could have purchased or leased space on any of this land—and would have done so but for the cost, which it deemed excessive. The parties debate whether WCS carried out a thorough search; Milwaukee says that with more diligence WCS could have acquired a properly zoned building within its budget. WCS acknowledges this but says that its search was reasonable. On our view of the law, however, this debate is irrelevant: Searching for bargains is no harder for WCS than for any other entity in the real-estate market, so the need to search is not a source of disparate impact.

WCS would experience extra costs in going back on the market, as it would need to pay another brokerage commission and might need to absorb a capital loss (though, if real estate prices have dropped, it could expect to gain as a buyer of a new site what it loses as a seller of the old), but the appropriate perspective is *ex ante*. WCS did not obtain any extra rights under federal law by buying a building while the special-use issue was up in the air. Otherwise anyone could strong-arm a city by the expedient of making a commitment and then pointing to the sunk costs. Moreover, WCS has experienced success in requesting special-use permits and zoning variances for its other facilities. Over the years WCS has requested special treatment of seven parcels, and six of these requests have been

granted—all but the one involved in this suit. Disparate impact is difficult to see. We don't say that it is impossible, however; WCS may have more evidence to offer.

The best hope for WCS may lie in showing actual discrimination, a subject that the district court did not reach. Much of the testimony before the Board of Zoning Appeals evinced antipathy to a mental-health clinic that would include many released convicts among its clientele. That some witnesses exemplified the "not in my back yard" approach does not necessarily mean that the Board took that (forbidden) view, but it did refer to community opposition as one reason for its decision. This implies that if WCS or some other organization had proposed to use the same building to perform checkups for a HMO or provide outpatient kidney dialysis, the Board might well have said yes. Such a difference in treatment would be discriminatory, and WCS would be entitled to relief under federal law. Whether the Board acted with discriminatory intent is a question of fact whose resolution belongs in the first instance to the district court. See *Pullman-Standard v. Swint*, 456 U.S. 273 (1982). The court may need to take additional evidence on this subject, rather than limit consideration to the record made before the Board, as it has done so far.

One final remark. The parties have devoted considerable energy to debating whether the proposed accommodation is reasonable, if one is required in order to overcome intentional discrimination or disparate impact. It is. See *Oconomowoc Residential Programs, Inc. v. Milwaukee*, 300 F.3d 775 (7th Cir. 2002). Milwaukee is barking up the wrong tree in arguing that federal judges must "defer" to local zoning codes when deciding what accommodations are reasonable. Federal statutes supersede state and local rules; the question whether an accommodation is required is one of federal law, though the extent to which a proposed accommodation would disrupt state policy must weigh in the balance, as *Barnett* and its predecessors show. See also,

e.g., *Ansonia Board of Education v. Philbrook*, 479 U.S. 60, 67-69 (1986) (discussing accommodation under Title VII of the Civil Rights Act of 1964); *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977) (same). Our difficulty with the district court's resolution concerns the initial question whether WCS is entitled to *any* accommodation, and that is the issue on which the parties now should concentrate their attention.

The judgment is vacated, and the case is remanded for further proceedings consistent with this opinion.

WOOD, *Circuit Judge,* dissenting. This case raises the question whether the City of Milwaukee was required under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §12131 *et seq.*, and the Rehabilitation Act, 29 U.S.C. §794 *et seq.*, to issue a special-use permit for the new outpatient mental health clinic that the plaintiffs (WCS) were trying to establish. The Milwaukee zoning code did not flatly prohibit this use, but it did require a special-use permit for properties located in the area where WCS wanted to locate. Concluding that the City was required as a matter of law to make reasonable accommodations to WCS's disabled clients (and hence to WCS), and that WCS had shown that the special-use permit was such a reasonable accommodation, the district court granted summary judgment in WCS's favor and ordered the City to issue the permit. The majority has vacated that order and remanded the case for further consideration of the question whether WCS can show that the City's refusal to grant the permit stemmed from actual discrimination against mentally disabled users of WCS's facility. I have no quarrel with the proposition that such a showing would entitle WCS to relief. In my view, however, further proceedings are unnecessary,

because WCS has already successfully shown that it is entitled to the permit under the "reasonable accommodation" theory recognized in Title II of the ADA and the Rehabilitation Act. I would therefore affirm.

As the majority acknowledges, Title II of the ADA and the Rehabilitation Act prohibit intentional discrimination against qualified persons with disabilities, as well as measures that have a disparate impact on the disabled. (Henceforth I refer only to the ADA, because it is identical for all material purposes in this case to the Rehabilitation Act.) Where we disagree is over the extent to which Title II of the ADA also independently obliges covered persons to make reasonable accommodations for the disabled. The agency responsible for administering the ADA, the U.S. Department of Justice, has issued a regulation that unambiguously imposes such an obligation:

> A public entity shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity.

28 C.F.R. §35.130(b)(7) (ADA). See also 28 C.F.R. §41.53 (containing a similar provision implementing the Rehabilitation Act). That regulation says nothing about an antecedent need to prove pre-existing intentional discrimination or disparate impact. Instead, it authorizes prophylactic measures that are "necessary to avoid discrimination on the basis of disability," unless the entity can satisfy the regulatory justification.

The most straightforward way to view this is as an affirmative obligation to take the steps that are necessary to bring the services available to the disabled up to the level that the nondisabled enjoy, which in one sense will require giving some benefits to the disabled that are unnecessary

for their more fortunate fellow citizens. A person with no mobility problem would never miss a wheelchair ramp; a person with 20/20 vision has no need for an audible signal in an elevator that the desired floor has been reached. But those accommodations are essential for the disabled person to enjoy equal access to public services. The Supreme Court recognized this concept when, in *US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002), it acknowledged that reasonable accommodations "will sometimes require affirmative conduct to promote entry of disabled people into the work force." *Id.* at 401. Although *Barnett* held that in the normal run of cases an employer would not be required to override a bona fide seniority system in order to accommodate a disabled employee's needs, it also held that the employee would be entitled to show that "special circumstances warrant a finding that, despite the presence of a seniority system . . ., the requested 'accommodation' is 'reasonable' on the particular facts." *Id.* at 405. At least for purposes of Title I of the ADA, therefore, the accommodation requirement imposes special responsibilities on employers that could not be derived from either the intentional discrimination theory or the disparate impact theory.

True, the majority says, but we are dealing with Title II of the statute, and it does not contain the same accommodation language as Title I. Literally speaking, that is true, but I do not understand the majority to be holding that the Department of Justice exceeded its authority when it issued the implementing regulations interpreting the requirements of Title II. To the contrary, it states that it is not taking issue with the regulation, 28 C.F.R. §35.130(b)(7), in this case. If not, then *Barnett*'s approach to reasonable accommodation is binding on us here: the language of §35.130(b)(7) is substantively identical to the language the Court was construing in Title I, 42 U.S.C. §12112(b)(5)(A).

The majority avoids this outcome by looking to two cases this court has decided under the closely analogous Fair

Housing Amendments Act (FHAA), 42 U.S.C. §3601 *et seq.*; namely, *Hemisphere Bldg. Co. v. Richton Park,* 171 F.3d 437 (7th Cir. 1999), and *Good Shepherd Manor Foundation, Inc. v. Momence,* 323 F.3d 557 (7th Cir. 2003). Those cases, it argues, demonstrate that there is actually no independent accommodation requirement under any of these statutes. Instead, the accommodation requirement has no independent force at all; it is merely a remedy for practices that have a disparate impact on the disabled. As the majority sees the world, "[i]n the absence of disparate impact . . . there is no need for accommodation under the FHAA," or by extension, under Title II of the ADA. *Ante* at 4. (It does not explain why the same logic would not apply to Title I of the ADA, except to acknowledge that *Barnett* forecloses this argument.)

The majority concedes that its position is inconsistent with language that appears in *Good Shepherd,* where the court wrote unequivocally that "'[f]ailure to reasonably accommodate' is an alternative theory of liability." *Ante* at 5; quoting 323 F.3d at 562. In an effort to squeeze *Good Shepherd* into its own theory of the FHAA and hence the ADA, it suggests that reasonable accommodation is an independent theory only insofar as it is "the means by which disparate impact is alleviated." *Ante* at 5. But that is not what *Good Shepherd* said. There is a difference between a theory of liability and a remedy for a proven violation. The problem with the majority's reasoning is reflected in its assumption that the disabled can suffer a deprivation of access to public services and programs only if (a) laws and regulations actively discriminate against them, or (b) laws and regulations produce disparate effects. Both of these theories, however, require a comparison between the effect of the practice on the favored group and the effect of the practice on the disfavored group— here, the disabled.

The problem is that there are many services and facilities that are of interest only to disabled people, such as the

ramps and the audible elevator announcements mentioned earlier. In those situations, there would never be a way to prove either individual animus or disparate impact, unless the latter theory were applied far more broadly than it normally is. Recall that disparate impact theory was born in *Griggs v. Duke Power Co.,* 401 U.S. 424 (1971), where the Court considered the question whether a high school diploma or GED requirement for hiring or transfer was having a disparate impact on minority candidates. Here, only the disabled would have any interest in the particular service or facility at issue; because the nondisabled are indifferent to it, there would never be a way to prove the disproportionate impact required by that theory. Moreover, the statistics needed to show disparate impact will often be unavailable to the disabled.

The approach I favor does not, contrary to the majority's implication, require one to conclude that *Good Shepherd* silently overruled our earlier decision in *Hemisphere Building.* In *Hemisphere Building,* another FHAA case, a developer argued that he was entitled to both re-zoning and a special-use permit so that he could build two four-unit residences for wheelchair-bound persons. Without the re-zoning, he would have been free to build identical residences suitable for the same population, but only six homes instead of eight, and he would have had to charge a higher price for them. On these facts, we held that the Village was under no duty to change its zoning practices. The duty of reasonable accommodation had to be confined to rules, policies, practices or services that hurt the disabled "*by reason of their handicap*, rather than that hurt them solely by virtue of what they have in common with other people, such as a limited amount of money to spend on housing." 171 F.3d at 440 (emphasis in original).

The district court's decision here fits comfortably within the rule announced in *Hemisphere Building* and is equally consistent with the elaboration found in *Good Shepherd.* It

focused on the rules, practices, etc., that hurt WCS and its clients because of their mental disabilities, as opposed to their lack of money, their physical appearance, or other characteristics that they share with many members of the general public. The desire for cheaper housing, which was what *Hemisphere Building* was all about in the end, is not limited to the disabled, and thus a limitation in the supply of cheap housing does not hurt the disabled by reason of their handicap. Mental health services, in contrast, are uniquely important for people with mental disabilities. If a city were to zone them entirely out of its territory, on the theory that mentally disabled people are unpleasant neighbors or visitors to commercial establishments, its action would be taken by reason of the disability and it would violate the ADA. What has happened here is something less than total exclusion, but that just means that there is a factual question to be explored. Here, the district court reasonably concluded that the exclusion was enough to trigger the duty to accommodate. Moreover, it is worth noting that the court also found that "the clinic would not conflict with City zoning" (309 F. Supp. 2d 1096, 1106 (E.D. Wis. 2004)); that special uses like the clinic are recognized as not inherently incompatible with the area (*id.)*; and that not only did the zoning board have the power to make this accommodation, but that this was a power that "the Milwaukee BOZA [Board of Zoning Appeals] has exercised willingly on previous analogous occasions" (173 F. Supp. 2d 842, 853 (E.D. Wis. 2001)).

In summary, this court had it right in *Good Shepherd* when it identified three separate ways of proving a claim under the FHAA, and there is no reason to shrink that number down to two for a claim brought under Title II of the ADA and the Rehabilitation Act. The majority's approach is inconsistent with the implementing regulations under Title II, and it risks having the unfortunate effect of barring the disabled from relief just when they need it most: when a public entity is failing to provide a service

that only the disabled would need, under circumstances where intentional discrimination and disparate impact would be impossible to prove as a practical matter. The only way to avoid such a result would be to expand the understanding of disparate impact well beyond its historical boundaries. Perhaps that is what the majority contemplates for its remand. In my view, the district court's understanding of the law was correct, and its findings of fact are supported by the record. I would affirm, and I therefore respectfully dissent.

A true Copy:

      Teste:

                        _____
                        *Clerk of the United States Court of Appeals for the Seventh Circuit*