In the

# United States Court of Appeals
### For the Seventh Circuit

———————

No. 04-1966

WISCONSIN COMMUNITY SERVICES, INC.
and WISCONSIN CORRECTIONAL
FOUNDATION, INCORPORATED,

*Plaintiffs-Appellees*,

*v.*

CITY OF MILWAUKEE,

*Defendant-Appellant*.

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01 C 575—**Lynn Adelman**, *Judge.*

———————

REARGUED EN BANC JANUARY 18, 2006—DECIDED SEPTEMBER 26, 2006

———————

Before FLAUM, *Chief Judge*, and BAUER, POSNER, EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, WOOD, EVANS and WILLIAMS, *Circuit Judges*.[Œ]

RIPPLE, *Circuit Judge.*   Wisconsin Community Services ("WCS"),[1] a provider of treatment to mentally ill patients, brought this action under Title II of the Americans with

---

[Œ] The Honorable Diane S. Sykes took no part in the consideration or decision of this case.

[1] Wisconsin Community Services was formerly Wisconsin Correctional Foundation. The name was changed while this action was pending in the district court.

Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, and section 504 of the Rehabilitation Act of 1973, *id.* § 794. The WCS sought an injunction ordering the City of Milwaukee ("the City") to issue a zoning permit that would allow it to move its mental health clinic to an area of Milwaukee, Wisconsin, where health clinics are permitted only on a case-by-case basis. The district court granted partial summary judgment to WCS, concluding that the ADA and the Rehabilitation Act obligated the City to accommodate the disabilities of WCS' patients by allowing WCS to move to its desired location. For the reasons set forth in this opinion, we reverse the judgment of the district court and remand for proceedings consistent with this opinion.

# I

## BACKGROUND

### A.  Wisconsin Community Services

WCS is a private, non-profit organization that provides a variety of inpatient and outpatient services to individuals afflicted with severe mental illnesses.[2] WCS provides patients, who cannot live alone without substantial assistance, with psychiatric treatment, counseling, medication monitoring, transportation and help in finding housing and employment. A number of WCS' patients have a history of substance abuse, and a majority have had previous run-ins with the criminal justice system; WCS often accepts patient referrals from court-related agencies

---

[2] The parties have stipulated that these individuals are "disabled" within the meaning of the ADA and the Rehabilitation Act. R.45, Ex.E-1 at 8.

such as the United States Probation Service. Although WCS staff sometimes will treat patients in their homes, most of WCS' services are administered in a 7,500 square-foot mental health clinic located at 2023 West Wisconsin Avenue in the City of Milwaukee. Originally, WCS shared this facility with other non-profit organizations, but, as its clientele grew, WCS expanded to occupy the entire building. In 1994, at the time of this initial expansion, WCS employed twenty full-time employees and served 250 patients.

By 1998, the staff at WCS' 2023 West Wisconsin Avenue facility had grown to approximately forty full-time employees serving approximately 400 patients. This increase in clients, services and personnel had caused a shortage in space available for employee parking, client treatment, group therapy sessions and other services. Faced with the shortage, WCS at first considered remodeling, but finally concluded that such a project would be too costly and would interfere with client care. WCS then began searching for a new building. Despite having a limited budget, WCS needed a facility that was located in a safe neighborhood and had adequate floor space, parking and access to public transit. After searching for three years, WCS was able to find two buildings that met its criteria. Neither property, unfortunately, was located in a neighborhood zoned for health clinics. Both were in areas where health clinics are permitted only as "special uses" that require issuance of a permit by the Milwaukee zoning authorities.

WCS previously had received this type of special use permit for some of its other facilities. It therefore made an offer of purchase for one of the properties, contingent on obtaining the necessary special use permit from the Milwaukee zoning board. The seller of this property, concerned about this contingency, declined to accept the offer. WCS

then abandoned its efforts to purchase that property and instead made a similar contingent offer on the other identified property. This facility was an 81,000 square-foot building located about one mile from its current facility at 3716 West Wisconsin Avenue. The larger facility is located in an area zoned as a "local business district." Milwaukee, Wis. Code § 295-703-1. According to the City Code's "use table," health care clinics, except for nursing homes, are deemed "special uses" for this zone. *Id.* § 295-603-1. Incidentally, the same zone allows foster homes, shelter care facilities, community living arrangements and animal hospitals either as "permitted" or "limited" (no special approval required) uses. *Id.* The seller accepted WCS' offer.

## B. The First Proceeding Before the Board of Zoning Appeals

Milwaukee's City Code defines "special use" as "[a] use which is generally acceptable in a particular zoning district but which, because of its characteristics and the characteristics of the zoning district in which it would be located, requires review on a case by case basis to determine whether it should be permitted, conditionally permitted, or denied." Milwaukee, Wis. Code § 295-7-166. Special use designations are instruments of municipal planning that allow city officials to retain review power over land uses that, although presumptively allowed, may pose special problems or hazards to a neighborhood. *See generally Delta Biological Res., Inc. v. Bd. Zoning Appeals*, 467 N.W.2d 164, 166-67 (Wis. Ct. App. 1991).

In Milwaukee, an applicant for a special use permit must present its plans to the Department of City Develop-

ment ("the DCD"), where they are reviewed by a plan examiner. If the DCD denies the special use application, the applicant may appeal the decision to the Milwaukee Board of Zoning Appeals ("BOZA"), where the application is reviewed, a public hearing is held and evidence is heard. *See* Wis. Stat. § 62.23(7)(e). Consistent with this procedure, WCS submitted a plan to DCD, outlining its intent to relocate the mental health clinic and several of its administrative offices to the new building. The plan stated that WCS would occupy 32,000 out of the 81,000 square feet of space in the building. An additional 12,000 square feet, according to the plan, would be occupied by two existing tenants, a Walgreens pharmacy and an office of the Social Security Administration. The remaining 37,000 square feet, the plan stated, would be rented out for use as office space or for other commercial purposes.

Under Wisconsin law, in deciding whether to issue a special use permit, the City's zoning officials are guided by four statutory considerations: (1) protection of public health, safety and welfare; (2) protection of the use, value and enjoyment of other property in the neighborhood; (3) traffic and pedestrian safety; and (4) consistency with the City's comprehensive plan. *See* Milwaukee, Wis. Code § 295-59-5.5. After reviewing WCS' plan, DCD concluded that these criteria had not been met. Specifically, DCD expressed concern over the second factor, protection of neighboring property value. It stated that use of the property as a mental health clinic would jeopardize the commercial revitalization that the neighborhood currently was undergoing. WCS, availing itself of its right to administrative review, then appealed the DCD's decision to Milwaukee's BOZA.

On March 22, 2001, BOZA held a hearing on WCS' appeal. At the outset, WCS argued that, even if its proposal did not

meet the special-use criteria, the ADA required BOZA to modify these criteria so that WCS would have the same opportunity to obtain a permit as would a clinic serving non-disabled individuals. BOZA denied this request because it did not believe that it had the authority to deviate from the City's zoning code. Indeed, BOZA prohibited WCS from introducing evidence on the issue. Confined to making its case under the unmodified special use considerations, WCS presented evidence in an effort to refute the perception that the mental health clinic posed a safety threat and would discourage businesses from locating in the neighborhood. This evidence included testimony from a security official who told BOZA that, based on his own investigation, WCS' patients had not been the source of any safety problems in WCS' current neighborhood. WCS also presented letters from its current neighbors to the same effect. Finally, WCS submitted evidence of an award it had received from the National Institute of Justice for exemplary care of previously institutionalized individuals with mental health needs.

BOZA then heard testimony in opposition to the permit. An attorney representing several area businesses testified that opening a mental health clinic that serves a large number of young, unemployed males with histories of mental illness and illegal behavior substantially increases the chance of crime and anti-social behavior in the neighborhood. In a similar vein, a nearby high school voiced its fear that WCS' clients would be riding public transit alongside its "young and vulnerable" students. R.15, Ex.B-1 at 43. Additionally, a neighborhood organization encouraged residents to object to WCS' request; it circulated leaflets that argued that the clustering of WCS' clientele "in one location on a daily basis raises a serious risk for the health and well being of people living and working in surrounding neighborhoods." *Id.*, Ex.B-3 at 327-28.

On May 9, 2001, BOZA voted unanimously to deny WCS' application for a special use permit. The accompanying written decision said only that the proposed use was inconsistent with the considerations set forth in the zoning code. However, several board members orally announced the reasoning behind their decision. One member noted that the "overwhelming" opposition from neighborhood residents convinced him that the WCS clinic would have "a damaging effect upon neighboring business." *Id.*, Ex.B-1 at 6. Another member stated that WCS' clientele, with its large number of convicted criminals, raised "red flags" for local residents. *Id.* at 7. These board members did not think that BOZA had the duty to question the "perceptions" of local residents regarding the possible dangers presented by WCS' patients. *Id.* at 6-7.

## C.   The First Federal Court Proceeding

Although Wisconsin law allows for direct review by a Wisconsin state court of adverse BOZA decisions, *see* Wis. Stat. § 62.23(10), WCS instead filed the present action in the United States District Court for the Eastern District of Wisconsin, *see Wisconsin Corr. Serv. v. City of Milwaukee*, 173 F. Supp. 2d. 842 (E.D. Wis. 2001) ("*WCS I*"). Its complaint alleged that BOZA had violated the ADA and the Rehabilitation Act by failing to make reasonable modifications to its methods for determining whether to issue a special use permit. The complaint also requested an injunction directing Milwaukee to issue the desired permit.

The district court held that BOZA had violated the federal disability laws when it failed even to consider making a reasonable modification to its policies to accommodate WCS' request. The court began its analysis by noting the

basic Supremacy Clause principle that federal laws are superior to conflicting local laws. *See* U.S. Const. art. VI, cl. 2. The court noted that invocation of this basic principle did not necessarily mean that WCS was entitled to a special use permit as an accommodation under the ADA. BOZA's failure even to consider WCS' accommodation request, however, had deprived the court of a sufficient factual record on which to determine whether WCS had a right to such an accommodation. The court directed that BOZA hear evidence on WCS' accommodation claim and determine: (1) whether WCS' patients are "disabled"; (2) whether the requested accommodation is "reasonable" and "necessary"; and (3) whether the requested relief would work a "fundamental change" to the services being rendered. *See WCS I*, 173 F. Supp. 2d at 853 (quoting 28 C.F.R. § 35.130(b)(7)).

### D. The Second Proceeding Before the Board of Zoning Appeals

On September 12, 2002, BOZA reconvened a public hearing to decide whether, and to what extent, the ADA and the Rehabilitation Act required it to modify its zoning policies in considering WCS' application for a special use permit. BOZA heard testimony regarding the necessity of a modification, whether such modification was a reasonable accommodation and whether it might work any fundamental change on the City's zoning practices.

Jill Fuller, WCS' clinic administrator, was the first to testify. She described the state of overcrowding at WCS' current facility and the effect that these conditions were having on WCS' patients. Individuals with severe mental disabilities, Fuller explained, are particularly sensitive to external stimuli and often have poor socials skills. Overcrowding in the common area of WCS' facility—a room

described by another WCS administrator as noisy, smoky and packed—created an extremely stressful environment for these patients and caused their symptoms to become more acute. Additionally, Fuller testified that overcrowding compromised the privacy of one-on-one therapy sessions, which represent a primary component of WCS' treatment.

WCS then presented testimony from its executive director, Stephen Swigart. He described the search process undertaken by WCS to find a new facility that, in addition to being of adequate size, would satisfy the clinic's need for a central location, access to public transit, a serviceable floor plan, low renovation costs and a safe neighborhood. Swigart testified that, after being denied the special use permit, WCS had worked with city planners to locate a suitably zoned property, but that its efforts had been unsuccessful. Any potential alternatives, Swigart explained, were either unavailable or too costly.

Finally, WCS presented expert testimony from Dr. Nancy Frank, the Chair and Associate Dean of the Department of Architecture and Urban Planning at the University of Wisconsin-Milwaukee. She opined that locating the mental health clinic at WCS' desired location, 3176 West Wisconsin Avenue, would have a positive rather than an adverse effect on the surrounding neighborhood. Pointing out that a properly zoned health clinic already was located directly across the street from the proposed site, Frank noted that WCS' clinic would be a consistent addition to the neighborhood and encourage commercial uses of a similar nature. In addition, Frank testified that the building at 3176 West Wisconsin Avenue had been mostly vacant for some time. According to Frank, the goal of city planners seeking to revitalize a commercial area should be to fill vacant space as quickly as possible. Frank predicted that relocating WCS

and all of its employees to the area would attract businesses such as "restaurants, dry cleaners [and] coffee shops" eager to serve the new influx of professionals. R.45, Ex.F-2 at 58. Frank further stated that "[i]t's actually a strategy in urban redevelopment to try to get a good non-profit anchor in an area first because they're often less dependant on having an area that already has a lot of consumer demand, and you can then build on that employee base." *Id.* When asked about safety concerns, Frank stated that four of the six parole offices in the City of Milwaukee were located in areas zoned for business use. Frank saw no reason why WCS' clinic would present any more of a safety risk than these offices.

BOZA then heard testimony from Michael Murphy, an alderman representing the area in which WCS was seeking to relocate its clinic. Steadfastly opposed to WCS' plans, Alderman Murphy stated that "WCS' thrust to rip an 81,000 square foot building out of the heart of this emerging business district could be fatal to this area." *Id.* at 94. When pressed on whether the new clinic conceivably could bring economic benefits to the neighborhood, Alderman Murphy conceded that the influx of professionals potentially could draw new businesses. He stated, nevertheless, that he objected to the plan because it meant that WCS, as a non-profit, would not pay tax on the space used for its clinic and operations; Alderman Murphy preferred a tax-paying commercial tenant in the space. Notably, the only submission on whether WCS' patients were a safety risk to the community were affidavits from business owners near the proposed site. None of these opinions, however, was supported by actual evidence.

On December 22, 2002, BOZA issued a written decision denying the special use permit to WCS. It concluded that

WCS' claim for an accommodation under the disabilities laws failed because such an accommodation was neither reasonable nor necessary. On the question of necessity, BOZA framed the inquiry as "whether the requested accommodation will ameliorate, that is, directly improve the burden of the mental illnesses from which [WCS' patients] suffer." *Id.*, Ex.H at 2. Concluding that WCS had not satisfied its burden on this issue, BOZA noted that mental illness, unlike a physical impairment, "is not a one size fits all handicap or disability within the ADA." *Id.* Rather, in BOZA's view, the mental disabilities suffered by WCS' patients were likely to vary dramatically across the patient population. It was therefore, according to BOZA, a "gross overgeneralization and speculation" for WCS to contend that each of its patients would respond favorably to treatment in the new, larger facility. *Id.* Moreover, in BOZA's estimation, the factors considered by WCS in seeking out a new facility were not linked to its patients' disabilities. According to BOZA, "[t]he WCS search criteria resemble those of many other commercial businesses, profit or non profit, which have outgrown their physical premises and want to move into a larger setting." *Id*.

BOZA concluded that, in addition to being unnecessary, the requested accommodation also was unreasonable. In making this determination, BOZA stressed that the relocation of WCS' clinic to its proposed site would "place an undue financial burden on the district," *id.* at 5, threatening "the economic survival [of] this already shaky neighborhood," *id.* at 6. According to BOZA, these costs to the City were not outweighed by the needs of WCS because WCS apparently had other relocation options available in other neighborhoods.

Finally, BOZA determined that the requested accommoda-

tion, in addition to being unreasonable and unnecessary, fundamentally would alter the City's zoning scheme:

> Every time a social service agency, AA club, homeless shelter serving mentally ill homeless people; hospital, psychologists or psychiatrists [sic] office, therapists' office, etc. wanted to locate their business in a zoning district requiring a special use to do so, the City or this Board would have to automatically consider giving them an accommodation under ADA regardless of the special use criteria in the City's ordinance.

*Id.* at 3.

### E.   The Second Federal Court Proceeding

On January 24, 2003, WCS reinstated its action in federal court challenging the second BOZA ruling. It alleged that the City's refusal to grant WCS a special use permit violated the ADA and the Rehabilitation Act. In determining the standard that it ought to employ in assessing WCS' accommodation claim, the district court declined, despite the parties' recommendation, to apply the test that governs cases arising under the Fair Housing Amendments Act of 1988 ("FHAA"). The FHAA requires a reasonable accommodation to zoning rules when necessary to afford a handicapped person the "equal opportunity" to obtain housing. 42 U.S.C. § 3604(f)(3)(B). In the district court's view, this standard did not apply to the present case because WCS sought its accommodation not to obtain housing but to provide mental health services to its patients. Moreover, the court continued, "unlike housing, the general public does not require mental health services; thus, in the present case, it makes little sense to inquire whether the disabled are entitled to equal opportunity to such services." *Wisconsin Cmty. Servs. v. City of Milwaukee*, 309 F. Supp. 2d 1096, 1105

(E.D. Wis. 2004) ("*WCS II*").

Instead, relying upon our decision in *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775 (7th Cir. 2002), the court held that, to satisfy its initial burden, WCS must show that its requested accommodation is (1) reasonable and (2) necessary to enhance affirmatively its disabled patients' " 'quality of life by ameliorating the effects of the disability.' " *WCS II*, 309 F. Supp. 2d at 1105 (quoting *Oconomowoc Residential Programs*, 300 F.3d at 784). Once WCS had made this showing, according to the district court, the City then must "demonstrate unreasonableness or undue hardship in the particular circumstances*." Id.*

Applying this framework, the court first assessed the accommodation's reasonableness by weighing the benefits to WCS' clients against the potential cost to the City of issuing the special use permit. In the court's view, WCS had presented convincing evidence that overcrowding was a real problem at its current facility and one that both aggravated the effects of its clients' disabilities and impaired WCS' ability to provide services that ameliorate such effects. The new, larger facility, the court stated, would solve this overcrowding problem and benefit WCS' patients substantially. Against this benefit, the court weighed the costs purportedly incurred by the City in undermining its zoning code, interfering with the revitalization of a business district and losing potential tax revenue. The court did not find these costs significant enough to outweigh the clear benefit that the special use permit would provide WCS. Crediting the testimony of Frank, the court found that WCS' new clinic actually would benefit the economic development of the neighborhood. In any event, noted the court, having a tenant in a vacant building was better than having no tenant at all. Further, the court took the view that, given WCS' plans to lease a majority of its new space to commercial

tenants, the City would not be deprived of substantial tax revenue.

The court next considered whether WCS had established that its requested accommodation was necessary. First, the court concluded that, for reasons it already had described in its reasonableness assessment, the proposed facility would ameliorate some of the effects of WCS' patients' disabilities. Second, the court rejected the City's argument that WCS could have moved its clinic to another location where a mental health clinic would not have required a special use permit. Under the court's view of the evidence, this option was too costly for WCS. Although recognizing that WCS perhaps could have searched for available properties more effectively, the court held that necessity may be established simply by evidence of a good-faith, albeit failed, attempt to find an alternative to the accommodation requested.

## II

## DISCUSSION

### A.

The legal question before us is whether, and to what extent, a city must modify its zoning standards to prevent them from discriminating against the disabled. The statutes relevant to answering that question are three separate but interrelated federal laws that protect persons with disabilities from discrimination. The first two laws chronologically were the Rehabilitation Act of 1973 and the FHAA. Enactment of the ADA followed in 1990. All three statutory schemes embrace the concept that, in certain instances, the policies and practices of covered entities must be modified to accommodate the needs of the disabled. We now shall examine each statute's accommodation requirement in

detail.

### 1.  The Rehabilitation Act of 1973

The Rehabilitation Act, 29 U.S.C. § 701 et seq., applies to federal government agencies as well as organizations that receive federal funds. The parties in this case stipulated that the City receives federal funding and is therefore covered by the Rehabilitation Act. Much of the Rehabilitation Act focuses on employment, but section 504 broadly covers other types of programs and activities as well. Section 504(a) provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

The Rehabilitation Act does not contain a general accommodation requirement. Rather, in implementing the Rehabilitation Act,[3] the Department of Health and Human Services ("HHS") promulgated several regulations that specifically require reasonable accommodations. *See Traynor*

---

[3]  Courts tend to look to the Rehabilitation Act's implementing regulations in interpreting other disability laws such as the ADA and the FHAA. *See, e.g.*, *Bragdon v. Abbott*, 524 U.S. 624, 631-32 (1998) (stating that courts are required to "construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act")*; see also* 42 U.S.C. § 12201 ("Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. § 790 et seq.) or the regulations issued by Federal agencies pursuant to such title.").

*v. Turnage*, 485 U.S. 535, 550 n.10 (1988) (observing that these regulations "were drafted with the oversight and approval of Congress and therefore constitute an important source of guidance on the meaning of § 504") (internal quotation marks and citations omitted)). The most pertinent of these regulations requires recipients of federal funds to "make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program." 28 C.F.R. § 41.53. The regulation's use of the terms "applicant or employee" suggests that it pertains most directly to workplace accommodation, rather than to the modification of a city's zoning practices.

Nevertheless, the Supreme Court has located a duty to accommodate in the statute generally. In *Alexander v. Choate*, 469 U.S. 287 (1985), handicapped individuals challenged a proposal by the State of Tennessee to reduce the number of inpatient hospital days that the state Medicaid program would pay hospitals on behalf of Medicaid recipients. Because handicapped individuals spend more time in hospitals, on average, than the non-disabled, the plaintiffs argued that Tennessee's proposal had a disproportionate effect on the disabled and hence was discriminatory in violation of section 504 of the Rehabilitation Act. After rejecting Tennessee's argument that federal law prohibits only intentional discrimination against the handicapped, the Court explained that "'a refusal to modify an existing program might become unreasonable and discriminatory.'" *Id.* at 300 (quoting *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 413 (1979)). The Rehabilitation Act's promise of "meaningful access" to state benefits, according to the Court, means that "reasonable accommodations in the grantee's program or benefit may have to be made." *Id.* at

301.

However, in applying this principle, the Court in *Choate* held that Tennessee's proposal, in fact, did not deny the plaintiffs "meaningful access" to Medicaid services. This was because "[t]he new limitation [did] not invoke criteria that have a particular exclusionary effect on the handicapped; the reduction, neutral on its face, [did] not distinguish between those whose coverage will be reduced and those whose coverage will not on the basis of any test, judgment, or trait that the handicapped as a class are less capable of meeting or less likely of having." *Id.* at 302. More specifically, the Court noted that there was no "suggestion" in the record "that the illnesses uniquely associated with the handicapped or occurring with greater frequency among them cannot be effectively treated, at least in part, with fewer than 14 days' coverage." *Id.* n.22. In short, the Court held that, because the denial of benefits was not linked in any way to the plaintiffs' particular disabilities, Tennessee's hospital-day reduction, even when left unmodified, did not offend the Rehabilitation Act.

Following *Choate*, several courts of appeals have adopted the view that the Rehabilitation Act requires public entities to modify federally assisted programs if such a modification is necessary to ensure that the disabled have equal access to the benefits of that program. *See, e.g., Henrietta D. v. Bloomberg*, 331 F.3d 261, 274-75 (2d Cir. 2003). These circuits, including ours, also follow the corollary principle implicit in the *Choate* decision that the Rehabilitation Act helps disabled individuals obtain access to benefits only when they would have difficulty obtaining those benefits "by reason of" their disabilities, and not because of some quality that they share generally with the public. *See, e.g., id.* at 276-79 (acknowledging "that the ADA and the

Rehabilitation Act are addressed to rules that hurt people with disabilities by reason of their handicap, rather than that hurt them solely by virtue of what they have in common with other people" (internal quotation marks, citations, alterations and emphasis omitted)); *Washington v. Indiana High Sch. Athletic Assoc.*, 181 F.3d 840, 848 (7th Cir. 1999) (noting that, in a Rehabilitation Act modification claim, "[t]here must be a causal connection between the disability and [the plaintiff's] ineligibility"); *Forest City Daly Housing v. Town of N. Hempstead*, 175 F.3d 144, 152 (2d Cir. 1999) (holding that, for claims under the FHAA, the ADA and the Rehabilitation Act, a proposed accommodation must be "necessary in light of the disabilities" of the plaintiffs; and dismissing claims because "no analogous housing opportunity exist[ed] for persons without disabilities" (internal quotation marks omitted)); *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996) (relying on *Choate* to require Hawaii to modify a law that required carnivorous animals entering the state, including guide dogs, to be quarantined for 120 days because the quarantine discriminated against the visually impaired "by reason of their disability"); *United States v. Bd. of Trs. of the Univ. of Alabama*, 908 F.2d 740, 748 (11th Cir. 1990) (recognizing that *Choate* requires an unmodified program to bear more heavily on the disabled on account of their disability and distinguishing the case of a deaf student who, unlike his non-handicapped peers, is less likely to benefit from his classes without a sign-language interpreter).

### 2. The Fair Housing Amendments Act

The duty to accommodate imposed by the FHAA, 42 U.S.C. § 3601 et seq., mirrors in large part the modification obligations under the Rehabilitation Act. Enacted in 1988,

the FHAA extended the scope of other federal housing laws to cover persons with disabilities. Under these amendments, disabled individuals may not be prevented from buying or renting private housing because of their disabilities. *See id.* § 3604. They also must be provided reasonable "accommodation in rules, policies, practices, or services when such accommodation may be necessary to afford [them] equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B).[4]

Although the plain language of the FHAA provides little guidance concerning the reach of its accommodation requirement, the contours of the obligation have been given substantial elaboration by this court and other courts of appeals. The basic elements of an FHAA accommodation claim are well-settled. First, the requested accommodation must be reasonable, which, as we have stated, is a "highly fact-specific inquiry and requires balancing the needs of the parties. An accommodation is reasonable if it is both efficacious and proportional to the costs to implement it." *Oconomowoc Residential Programs*, 300 F.3d at 784 (internal citations omitted). In the zoning context, a municipality may

---

[4] The legislative history of the Fair Housing Amendments Act explains:

> The Committee intends that the prohibition against discrimination against those with handicaps apply to zoning decisions and practices. The Act is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community.

H.R. Rep. No. 100-711, at 24 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2185.

show that a modification to its policy is "unreasonable if it is so at odds with the purpose behind the rule that it would be a fundamental and unreasonable change." *Id.* (internal quotation marks and citations omitted).

Second, the requested accommodation must be "necessary," meaning that, without the accommodation, the plaintiff will be denied an equal opportunity to obtain the housing of her choice. *See id.* at 784; *see also Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1155 (9th Cir. 2003); *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996). This has been described by courts essentially as a causation inquiry. *See, e.g., Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 460 (3d Cir. 2002) ("This requirement has attributes of a causation requirement. And if the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be necessary." (internal quotation marks and citations omitted)).

In addition, the FHAA links the term "necessary" to the goal of "equal opportunity." 42 U.S.C. § 3604(f)(3)(B). The "equal opportunity" element limits the accommodation duty so that not every rule that creates a general inconvenience or expense to the disabled needs to be modified. Instead, the statute requires only accommodations necessary to ameliorate the effect of the plaintiff's disability so that she may compete equally with the non-disabled in the housing market. We have enforced this limitation by asking whether the rule in question, if left unmodified, hurts "handicapped people *by reason of their handicap*, rather than . . . by virtue of what they have in common with other people, such as a limited amount of money to spend on housing." *See Hemisphere Bldg. Co. v. Vill. of Richton Park*, 171 F.3d 437, 440 (7th Cir. 1999) (emphasis in original).

Most recently, we considered the "equal opportunity" limitation in deciding an FHAA claim brought by a group home challenging a city's ad hoc decision to shut off the water supply to the group home's land. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 561-64 (7th Cir. 2003). Rejecting the group home's claim that the city had to modify its decision because shutting off its water harmed its disabled residents by preventing them from living in group homes, we stated that "[c]utting off the water prevents anyone from living in a dwelling, not just handicapped people." *Id.* at 562. Put differently, the plaintiff's accommodation claim failed because the disability suffered by the group home's residents did not deny them an equal opportunity to obtain housing.[5]

---

[5] Other circuits similarly have adopted the view that the FHAA's accommodation requirement is limited only to lowering barriers to housing that are created by the disability itself. *See, e.g., Forest City Daly Housing v. Town of N. Hempstead*, 175 F.3d 144, 151-53 (2d Cir. 1999) (upholding the decision of a zoning board to prevent a developer of an assisted living facility to relocate to a business zone and agreeing with the district court that "reasonable accommodations were not necessary to afford prospective residents an equal housing opportunity, because persons without disabilities do not have opportunities analogous to those being sought here"); *Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 604 (4th Cir. 1997) ("The 'necessary' element—the FHA provision mandating reasonable accommodations which are *necessary* to afford an equal opportunity—requires the demonstration of a direct linkage between the proposed accommodation and the 'equal opportunity' to be provided to the handicapped person. This requirement has attributes of a causation requirement. And if the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be

(continued...)

### 3. Title II of the Americans with Disabilities Act

The ADA was built on the Rehabilitation Act and the FHAA, but extends the reach of those laws substantially. Invoking "the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce," the ADA was designed "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1), (b)(4). It forbids discrimination against persons with disabilities in three major areas of public life: (1) employment, which is covered by Title I of the statute, *id.* § 12111-12117; (2) public services, programs and activities, which are the subjects of Title II, *id.* § 12131-12165; and (3) public and private lodging, which is covered by Title III, *id.* § 12181-12189. *See generally, Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004).

This case concerns Title II, commonly referred to as the public services portion of the ADA. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132.

As courts have held, municipal zoning qualifies as a public "program" or "service," as those terms are employed in the ADA, and the enforcement of those rules is an

---

[5] (...continued)
'necessary.'" (emphasis in original)); *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996) (concluding that, to satisfy the "necessary" element of a FHAA accommodation claim, the "[p]laintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice").

"activity" of a local government.[6] Section 12131(2) goes on to define "qualified individual with a disability" as

> an individual with a disability who, with or without *reasonable modifications* to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

(emphasis added).[7]

Unlike Title I and Title III, Title II of the ADA does not contain a specific accommodation requirement.[8] Instead, the

---

[6] *See, e.g., Bay Area Addiction Research v. City of Antioch*, 179 F.3d 725, 730-32 (9th Cir. 1999) (applying Title II to a city's zoning requirements); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 48-49 (2d Cir. 1997) (same).

[7] In the opening provisions of the ADA, Congress made the following finding, applicable to the statute in all parts:

> individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, [and] *failure to make modifications to existing facilities and practices . . . .*

42 U.S.C. § 12101(a)(5) (emphasis added).

[8] Title I provides that an employer unlawfully discriminates by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). Similarly, Title III's definition of discrimination includes "a failure to make

(continued...)

Attorney General, at the instruction of Congress,[9] has issued an implementing regulation that outlines the duty of a public entity to accommodate reasonably the needs of the disabled. The Title II regulation reads:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7).[10]

Before proceeding with an assessment of the case before

---

[8]  (...continued)
reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities." *Id.* § 12182(b)(2)(A)(ii).

[9]  *See* 42 U.S.C. § 12134(a) ("[T]he Attorney General shall promulgate regulations in an accessible format that implement this part."). The Attorney General's regulations, Congress further directed, "shall be consistent with this chapter and with the coordination regulations . . . applicable to recipients of Federal financial assistance under [§ 504 of the Rehabilitation Act]." *Id.* § 12134(b).

[10] The Supreme Court never has decided whether these regulations are entitled to the degree of deference described in *Chevron, U.S.A. Inc. v. National Resource Defense Council, Inc.*, 467 U.S. 837, 844 (1984). Nevertheless, the Court has said that, "[b]ecause the Department of Justice is the agency directed by Congress to issue regulations implementing Title II . . . its views warrant respect." *Olmstead v. L.C.*, 527 U.S. 581, 597-98 (1998) (internal citations omitted).

us, we pause for a closer examination of the regulation promulgated under the ADA because the text of this regulation gives us several important guideposts for the resolution of this case. First, as our cases already hold, failure to accommodate is an *independent* basis for liability under the ADA. Second, the plain language of the regulation also makes clear that an accommodation only is required when *necessary* to avoid discrimination *on the basis of* a disability. Third, the regulation states, in its plain language, that any accommodation must be a *reasonable* one. We shall now examine each of these features of the regulation, keeping in mind that Congress has expressed its desire that interpretation of the ADA be compatible with interpretation of the other federal disability statutes, a point also made clear in several holdings of the Supreme Court.[11]

Under the Title II regulation, a modification must be "necessary to avoid discrimination on the basis of disability." *Id.* In this way, the regulation differs slightly from the accommodation regulation promulgated under the Rehabilitation Act, which does not contain any express language regarding necessity. *See id.* § 41.53. However, as we noted earlier, *Choate* seems to read the Rehabilitation Act as containing a necessity requirement.

Similarly, there is a minor difference between the Title II regulation and the FHAA's accommodation provision. Although the FHAA's accommodation provision does contain an express necessity requirement, the text is different from the ADA regulation. The FHAA version reads

---

[11] *See, e.g., Bragdon*, 524 U.S. at 631-32 (stating that courts are required to "construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act").

"necessary to afford . . . equal opportunity," 42 U.S.C. §
3604(f)(3)(B); by contrast, the ADA version reads "necessary
to avoid discrimination on the basis of disability," 28 C.F.R.
§ 35.130(b)(7). Nevertheless, as we have interpreted it, the
Title II regulation, like the FHAA provision, links necessity
to a causation inquiry. In the context of the FHAA, we have
enforced this limitation by asking whether the rule in
question, if left unmodified, hurts "handicapped people *by
reason of their handicap*, rather than . . . by virtue of what they
have in common with other people, such as a limited
amount of money to spend on housing." *See Hemisphere
Bldg. Co.*, 171 F.3d at 440 (emphasis in original). Similarly,
under our Title II case law, the "on the basis of" language
requires the plaintiff to show that, "but for" his disability,
he would have been able to access the services or benefits
desired. *See Washington v. Indiana High Sch. Athletic Assoc.*,
181 F.3d 840, 849 (7th Cir. 1999) (requiring a high school to
modify its rule prohibiting "red-shirting" for a student
whose learning disability required him to miss a year of
school). Moreover, Title II's necessity component mirrors the
judicial gloss afforded to the Rehabilitation Act in *Choate*. As
in *Choate*, a plaintiff invoking Title II's modification require-
ment must show that his disability is what causes his
deprivation of the services or benefits desired. In short, each
of these provisions requires the plaintiff to satisfy the
"necessary" element by showing that the reason for his
deprivation is his disability.

The regulation also requires that any accommodation be
a reasonable one. In the context of the FHAA, we have
interpreted this requirement to mandate an inquiry into
whether the accommodation is "both efficacious and
proportional to the costs to implement it." *Oconomowoc
Residential Programs*, 300 F.3d at 784. In the zoning context,
a municipality may show that a modification to its policy is

"unreasonable if it is so at odds with the purpose behind the rule that it would be a fundamental and unreasonable change." *Id.* (internal quotation marks and citations omitted). This assessment is "a highly fact-specific inquiry and requires balancing the needs of both parties." *Id.* In this regard, we think it is important to note that, in undertaking this highly fact-specific assessment, it is necessary that the court take into consideration *all* of the costs to *both* parties. Some of these costs may be objective and easily ascertainable. Others may be more subjective and require that the court demonstrate a good deal of wisdom in appreciating the intangible but very real human costs associated with the disability in question. On the other side of the equation, some governmental costs associated with the specific program at issue may be a matter of simply looking at a balance sheet. Others, however, may be those intangible values of community life that are very important if that community is to thrive and is to address the needs of its citizenry.[12]

---

[12] Contrary to the assertions of the City, *see* Appellant's Br. at 40-42 (quoting *Bryant Woods, Inc. v. Howard County, Maryland*, 124 F.3d 597, 603 (4th Cir. 1997)), we do not believe that, in conducting this reasonableness inquiry, the district court owes special deference to the City's zoning ordinance. The House Report accompanying the FHAA noted specifically that "[t]he Committee intends that the prohibition against those with handicaps apply to zoning decisions and practices." H.R. Rep. No. 100-711, at 24 n.63 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2185. Furthermore, the House had rejected an amendment to the FHAA that "mandated" a showing of discriminatory "intent before a zoning decision [could be] struck down." *See id.* at 89 (additional views of Representatives Swindall, Sensenbrenner, Shaw, Dannemeyer, Coble and Slaughter). Because the ADA is founded
(continued...)

We pause to emphasize one other important feature of the Title II regulation. We think that the regulation makes clear that the duty to accommodate is an independent basis of liability under the ADA. The language of the regulation itself certainly supports this view. By requiring measures that are "necessary to avoid discrimination on the basis of disability," 28 C.F.R. § 35.130(b)(7), the regulation clearly contemplates that prophylactic steps must be taken to avoid discrimination. Indeed, we have taken this view in our earlier cases, and other circuits also have favored this interpretation. *See McGary v. City of Portland*, 386 F.3d 1259, 1266 (9th Cir. 2004) ("The district court's suggestion that McGary must allege that the City inconsistently enforced its nuisance abatement policy misses the point of a reasonable accommodation claim. Indeed, the crux of a reasonable accommodation claim is a facially neutral requirement that is consistently enforced."); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276-77 (2d Cir. 2003) ("[A] claim of discrimination based on a failure reasonably to accommodate is distinct from a claim of discrimination based on disparate impact.").[13]

---

[12] (...continued)
on the FHAA and is intended to expand upon rights guaranteed by that act, *see supra* at 21-22, we believe that these statements provide guidance with respect to the ADA, especially in the absence of contrary statutory language or legislative history specific to the ADA. The one-sentence dicta to the contrary in *Bryant Woods* is, notably, unsupported by citation. *See* 124 F.3d at 603.

[13] Similarly, in *Olmstead*, two mentally ill patients brought a Title II action against a state hospital that refused to place them in a community living environment. The Court rejected the state's argument that "discrimination" under Title II "necessarily

(continued...)

Under the law of this circuit, a plaintiff need not allege either disparate treatment or disparate impact[14] in order to state a reasonable accommodation claim under Title II of the ADA. *See Washington*, 181 F.3d at 846-48 (describing the showing of a failure to accommodate as an independent method of proving discrimination under Title II); *cf. Good Shepherd Manor Found.*, 323 F.3d at 561-62 (holding that "reasonable accommodation is a theory of liability separate from intentional discrimination"). In sum, a Title II claim under the ADA "may be established by evidence that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Washington*, 181 F.3d at 847. The district court resolved WCS' claim employing the second approach, *see Wisconsin Community Serv.*, 309 F. Supp. 2d at 1104, and our case law provides support for

---

[13] (...continued)
requires uneven treatment of similarly situated individuals." 527 U.S. at 598 (internal quotation marks omitted). "[S]atisfied that Congress had a more comprehensive view of the concept of discrimination advanced in the ADA," *id.*, the Court went on to hold that the state hospital violated Title II and 28 C.F.R. § 35.130(b)(7) by failing to accommodate the plaintiffs' request for community living, *id.* at 607.

[14] We understand the City to be using "disparate impact" to signify the method of proof under anti-discrimination laws that compares the treatment among otherwise similarly situated individuals. *See, e.g., Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988) ("The evidence in these 'disparate impact' cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities.").

such a cause of action.[15]

**B.**

With the key legislative provisions in full view, we turn now to the task of applying them to the case before us. In essence, we must decide whether, and to what extent, the Rehabilitation Act and Title II require the City to modify its zoning practices in order to accommodate the needs of the disabled individuals served by WCS.

WCS submits that the City must waive application of its normal special-use criteria for WCS because it has shown that granting the permit will ameliorate overcrowding, a condition that particularly affects its disabled clients. Before accepting this position, however, we must ask whether WCS has satisfied the "necessity" element contained in the Rehabilitation Act as interpreted by *Choate* and in the Title II regulation, *see* 28 C.F.R. § 35.130(b)(7). WCS contends that the necessity element is satisfied simply when a modification *helps* the disabled, regardless of whether it is *necessary* to alleviate discrimination. Implicit in this position is that the federal accommodation obligation reaches not only rules that create barriers "on the basis of" a person's disability, but also rules that are not disability-based and create obstacles to persons because of some factor unrelated to disability.

As we already have discussed, with respect to the Rehabil-

---

[15] Because the district court resolved WCS' ADA claim on a reasonable accommodation basis, it did not have occasion to reach WCS' disparate impact or disparate treatment arguments. We therefore do not address, nor do we offer any comment on, the merits of those claims.

itation Act, *Choate* held that a modification is "necessary" only when it allows the disabled to obtain benefits that they ordinarily could not have by reason of their disabilities, and not because of some quality that they share with the public generally. *See Choate*, 469 U.S. at 302; *cf. Hemisphere Bldg. Co.*, 171 F.3d at 440 (asking whether the rule in question, if left unmodified, hurts "handicapped people *by reason of their handicap*, rather than . . . by virtue of what they have in common with other people, such as a limited amount of money to spend on housing" (emphasis in original)). The inquiry is the same under the ADA regulation, which asks whether a modification is "necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7). Framed by our cases as a causation inquiry, the element is satisfied only when the plaintiff shows that, "but for" his disability, he would have been able to access the services or benefits desired. *See Washington,* 181 F.3d at 849.

On the present record, WCS' inability to meet the City's special use criteria appears due not to its client's disabilities but to its plan to open a non-profit health clinic in a location where the City desired a commercial, taxpaying tenant instead. As far as this record indicates, the City would have rejected similar proposals from non-profit health clinics serving the non-disabled. WCS contends that Title II's accommodation requirement calls, in such a situation, for " 'preferential' treatment and 'is not limited only to lowering barriers created by the disability itself.' " Appellee's Br. at 30 n.5 (quoting *Giebeler*, 343 F.3d at 1154). WCS' view, however, is inconsistent with the "necessity" element as it has been defined under the Rehabilitation Act, the FHAA and Title II of the ADA. On this record, because the mental illness of WCS' patients is not the cause-in-fact of WCS' inability to obtain a suitable facility, the program that it seeks modified does not hurt persons with disabilities

*"by reason of their handicap." Hemisphere Bldg. Co.*, 171 F.3d at 440 (emphasis in original).

WCS responds that the Supreme Court's decision in *US Airways, Inc. v. Barnett*, 535 U.S. 391 (2001), has overruled the principle, central to previous Title II accommodation decisions, that the proposed modification must be necessary to avoid discrimination on the basis of a disability. In *Barnett*, a case decided under Title I of the ADA, a US Airways baggage handler injured his back and requested transfer to a mailroom position that recently had become available. US Airways refused because, under its seniority policy, the company was required to award the position to a more senior employee. Recognizing that US Airways' seniority policy must yield, under certain circumstances, to the needs created by the plaintiff's disability, the Supreme Court held that the plaintiff should be permitted to rebut the presumption that his requested modification to the neutral seniority policy was unreasonable.

According to WCS' characterization, in *Barnett*, the seniority policy treated the disabled and non-disabled alike, and it was a non-disability characteristic (seniority) that denied Barnett the job. WCS sees no distinction between *Barnett* and the present case: Just as the plaintiff in *Barnett* was ineligible for the mail room position because of his seniority rather than his disability, WCS was ineligible for a special use permit because it was a non-profit health clinic, not because its clients were disabled. Because the Supreme Court allowed *Barnett*'s claim to go forward, albeit with a heightened burden of persuasion, WCS submits that it has satisfied the necessity element of its accommodation claim.

We cannot accept this argument. *Barnett* and the present case simply deal with different analytical problems. Fairly read, *Barnett* did not deal with the issue of necessity-causal-

ity, which was addressed in the cases we discussed earlier. Rather, it dealt with the second question that courts must confront in Title II accommodation cases: whether the accommodation was reasonable. Yet, this element cannot be reached until it has been determined that an accommodation is necessary because a person's disability is the cause for his being denied the service or benefit. As we explained earlier, to satisfy Title II's necessity element, a plaintiff must show that, "but for" its disability, it would have received the ultimate benefit being sought—which, in WCS' case, is a larger facility. *Washington*, 181 F.3d at 849. The same is true under the Rehabilitation Act. *See Choate*, 469 U.S. at 302. If the City's zoning rules are to be compared to the seniority policy in *Barnett*, WCS must demonstrate that, *because* of its clients' disabilities, it cannot relocate to a suitable site. Only then will the unmodified policy hurt the disabled *on account of* their disability. Only then will the modification be "necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

The district court assumed that the proposed modification could be deemed "necessary" even if the disabilities suffered by WCS' patients were not the cause-in-fact of its inability to find a larger building. The district court failed to apply a "but for" causation standard in determining the necessity element of WCS' accommodation claim. Choosing this course was error in light of the prevailing standards under our case law. We therefore must remand to the district court so that it may afford the parties the opportunity to develop the question of whether WCS has been prevented, *because of its clients' disabilities*, from locating

a satisfactory new facility.[16]

## Conclusion

For the foregoing reasons, we reverse the judgment of the district court and remand for proceedings consistent with this opinion. The City may recover its costs in this court.

REVERSED and REMANDED

EASTERBROOK, *Circuit Judge*, concurring. One question on which the parties have disagreed is whether 28 C.F.R. §35.130(b)(7), which was promulgated under Title II of the Americans with Disabilities Act, establishes an accommodation requirement in addition to the statutory rules

---

[16] Because we have determined that the district court erred in determining whether the accommodation was "necessary," we need not reach the question of whether its determination that the accommodation was "reasonable" was error.

Also, as noted above, *see supra* note 15, because the district court resolved WCS' claim on the failure of the City to offer a reasonable accommodation, the court did not address WCS' alternative theories of disparate impact and disparate treatment. The district court is free to consider those claims on remand should WCS ultimately fail with respect to its reasonable accommodation claim.

that prohibit disparate treatment and limit disparate impact. The district judge said "yes," the panel said "no," and now the en banc court says "yes." Having written the panel's opinion saying "no," see 413 F.3d 642, 646-47 (7th Cir. 2005), I now join the en banc opinion saying "yes," because further consideration has led me to conclude that the right question is what this regulation means rather than what label to attach to its provisions.

The regulation provides:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

A proposed accommodation is required only if it is "necessary" to "avoid discrimination". That an alteration in zoning rules would be convenient or helpful to a plaintiff does not make the change "necessary." Moreover, "discrimination" exists only if the zoning regulation (or other rule at issue) hurts "handicapped people *by reason of their handicap*, rather than . . . by virtue of what they have in common with other people, such as a limited amount of money to spend" (slip op. at 18, 21, 26-27 & 32, all quoting from *Hemisphere Building Co. v. Richton Park*, 171 F.3d 437, 440 (7th Cir. 1999) (emphasis in original)). That was the panel's view as well. 413 F.3d at 646.

In a brief *amicus curiae* filed at the court's request, the Civil Rights Division of the Department of Justice told us that this regulation creates an accommodation requirement distinct in the sense that disparate impact may be established by case-specific as well as statistical evidence. In employment-

discrimination litigation under Title VII of the Civil Rights Act of 1964 or the Age Discrimination in Employment Act, a "disparate impact" means a statistically significant adverse effect of a rule that is neutral in its terms. There is no good reason, however, why a regulation may not take a different approach to disparate-impact theories in disability-discrimination cases, where the circumstances of the affected persons may be so different—and the number of zoning or housing-code rules so numerous—that statistical analysis would be impractical. Title II does not specify a regimen for disparate-impact analysis, which means that a regulation requiring local zoning rules to yield when "necessary" to avoid applicant-specific disparate impacts that occur by reason of disability is a reasonable way to implement the statute. So I accept the Civil Rights Division's reading of this regulation, and I understand the court's opinion to do so too.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
